**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**WESTERN DIVISION**

| | | |
|---|---|---|
| SYLVIA A. OVIEDO, | ) | Case No. 11 C 50262 |
| | ) | |
| Plaintiff, | ) | |
| | ) | Hon. P. Michael Mahoney |
| v. | ) | U.S. Magistrate Judge |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

**I.     Introduction**

Sylvia A. Oviedo ("Claimant") seeks judicial review of the Social Security

Administration Commissioner's decision to deny her claim for Disability Insurance Benefits

("DIB"), under Title II of the Social Security Act, and Supplemental Security Income ("SSI")

benefits, under Title XVI of the Social Security Act. *See* 42 U.S.C. § 405(g). This matter is

before the Magistrate Judge pursuant to the consent of both parties, filed on November 18, 2011.

*See* 28 U.S.C. § 636(c); Fed. R. Civ. P. 73.

**II.     Administrative Proceedings**

On April 16, 2009, Claimant applied for DIB and SSI, alleging that she was disabled as

of October 1, 2008. (Tr. 11) This initial DIB and SSI application was denied on August 21, 2009.

(Tr. 69-70.) Claimant's application was denied a second time upon reconsideration on January

14, 2010. (Tr. 71-72.) Claimant then filed a timely request for a hearing before an Administrative

Law Judge ("ALJ"). (Tr. 92-93.) Her request was granted and the hearing took place before ALJ

Roxanne J. Kelsey via video teleconference between Orland Park and Rockford, Illinois on September 15, 2010. (Tr. 27-28.) Claimant appeared and testified in Rockford with her attorney present. (Tr. 27-28, 31.) Vocational expert ("VE"), Matthew Lampley, also testified before the ALJ. (Tr. 25, 35.)

Nine days after the hearing, the ALJ found that Claimant was not disabled, and therefore, denied her claims for DIB and SSI. (Tr. 11-20.) In response, Claimant filed a Request for Review with the Social Security Administration and the Appeals Council denied Claimant's request. (Tr. 1-6.) As a result of this denial, the ALJ's decision is considered the final determination of the Commissioner. *See* 20 C.F.R. §§ 404.981, 404.981, 416.1455, 416.1481. Claimant now files a complaint in this Federal District Court, seeking judicial review under 42 U.S.C. §§ 405(g), 1383(c)(3).

### III.    <u>Background and Hearing Evidence</u>

Claimant believes that she is disabled due to bipolar disorder and depression. She was born on February 22, 1981 and was twenty-nine years old when she appeared for the ALJ hearing. (Tr. 69.) Claimant was approximately five-feet and six-inches tall and weighed approximately 240 pounds. (Tr. 373.) She was married and had children but stated that she lived separate from her family at the time. (Tr. 32.)

Claimant was incarcerated and dropped out of school after she completed the eighth grade. (Tr. 32-33.) Although she would eventually earn her general equivalency degree ("GED"), she claimed to have only "basic" math, reading, and writing skills at the hearing. (Tr. 33-34, 57.)

The ALJ first questioned Claimant's attempts to find work after her alleged disability onset in 2008. (Tr. 34-36.) She was employed several times, but none of these occupations

seemed to last long; Claimant was consistently "let go" after only a number of days on the job. (Tr. 36-37.) Between 2008 and 2010, Claimant's occupations included selling ice cream, housekeeping, temporary office work, and washing dishes. (Tr. 36-37.) Even before her onset date, Claimant held many jobs with similar results. (Tr. 37.) She had been a self-employed "waitress"[1], a food packer, manufacturer, animal slaughterer, and a lumber picker. (Tr. 37-40.) All of these jobs would last only a number of months before Claimant would be fired by her employers. (Tr. 37-40.)

The ALJ asked Claimant if there was anything that changed her circumstances on-or-near her onset date that might have made it more difficult to work than it had been before. (Tr. 41.) Claimant answered that she thought that it had always been difficult; "It's just maybe my health, maybe my moods are now . . . worse than they used to be[,] my fighting with people [and] my not getting along," she said. (Tr. 41.)

Next, Claimant was questioned concerning her past and present legal problems. (Tr. 42.) The record indicates that Claimant has an extensive criminal history. (Tr. 328.) "You name it, I have done it, except for murder," she once explained during an assessment. (Tr. 328.) In fact, Claimant had been in jail approximately a month prior to the hearing date for contempt of court and her two children were also no longer living with her and they were staying with family friends after a domestic dispute. (Tr. 42-43, 46.)

Claimant also acknowledged her history of drug abuse at the hearing. (Tr. 45.) Although the record also indicates some history of alcohol abuse, she claimed that it was not an issue for her anymore as she stopped drinking after a DUI charge years earlier. (Tr. 49.) She stated that she never used "too much cocaine" and that marijuana was usually her drug of choice; (Tr. 45.)

---

[1] "I really wasn't even a waitress. I guess it was more to entertain the people, the customers, because I really wasn't waitressing," Claimant testified.  (Tr. 37) "[I was] just keeping drunk men company at a bar." (Tr. 38.)

"I smoked marijuana . . . when I was on a rampage and I was ready to explode[.]" She explained that she only smoked marijuana to self-medicate and calm down. (Tr. 45.) However, Claimant stressed that her illegal drug use ceased when she was put on medication by her doctors. (Tr. 45-46.) Unfortunately, she lost her medical card when her children were taken away and therefore she had not been taking any prescribed medicine at the time of the hearing. (Tr. 46-47.)

When asked about the effectiveness of her prescribed medication, she said medicine, such as Lithium and Seroquel, sometimes made her feel better. (Tr. 50.) But the side-effects related to those drugs began to bother her over time; "I couldn't breathe when I was sleeping," she said. "My hands . . . and my feet would ache." (Tr. 50.)

On a normal day, Claimant said that she will often just stay home. (Tr. 51.) She is able to cook, but only uses the microwave to prepare food. (Tr. 52.) Claimant asserted that she does not go shopping or wash clothes. (Tr. 52.) Her mother does all of Claimant's grocery shopping and her roommates do her laundry. (Tr. 52.) Claimant cannot drive as her license was revoked after numerous accidents and she will only leave the house twice a week if she has appointments, court, or "something that [she has] to do." (Tr. 32. 52-53.)

Claimant said that she does not have lifting limitations, but claimed that her back hurts when she sits too long and her ankles hurt when she walks; "They're always in pain," she added. (Tr. 54.)

She testified that she is not able to "remember things" and is unable to finish television programs or movies because she gets bored easily. (Tr. 55.) She explained that she has trouble completing tasks at work and cannot stay focused. (Tr. 57.) Claimant also reported trouble sleeping at night and she tends to wake up almost every hour, even while she is not on her medication. (Tr. 52.)

Her sisters or mother will visit her at times, but the visits will often end in a fight. (Tr. 53.) Claimant asserted that she will fight with anybody. (Tr. 55.) For example, she relayed that she had been recently kicked out of a jewelry store because she started "screaming and yelling" and the police were called to the scene. (Tr. 55.)

Indeed, when Claimant lost her jobs, it was generally due to her fighting, arguing, or her poor behavior in general. (Tr. 37-40, 56-57.) "People are scared to be around me," she explained; "People don't feel safe . . . . They don't trust me." (Tr. 56.) The ALJ had no further questions. (Tr. 56.)

The VE was then called to testify. (Tr. 60.) The ALJ posed her first hypothetical, describing an individual "with the residual functional capacity to perform routine, repetitive tasks, with *no more than occasional contact* with co-workers, supervisors[,] or the public." (Tr. 61.) (emphasis added). The VE concluded that such an individual would not be able to perform Claimant's past work. (Tr. 62.)

Next, the ALJ asked if there were any occupations that "a younger individual with a . . . high[-]school equivalent education and [Claimant's] past relevant work experience [and] the residual functional capacity set forth above" could perform. (Tr. 62.) In response, the VE identified certain jobs existing in substantial numbers within northern Illinois that the hypothetical person could perform: sorter (21,000 jobs), laundry worker (52,000 jobs), and warehouse worker (32,000 jobs). (Tr. 63.)

The ALJ asked the VE to consider a second hypothetical: "assume an individual with the residual functional capacity to only perform routine, simple, repetitive tasks with *no more than brief and superficial contact* with co-workers, supervisors[,] and the public after the training

period is complete," she inquired. (Tr. 63.) (emphasis added). The VE concluded that such an individual would also be able perform the previously identified occupations. (Tr. 64.)

Finally, Claimant's attorney asked the VE to consider a hypothetical individual that "would only be able to maintain attention and concentration on nothing greater than on an occasional basis" and was "unable to engage in even brief, superficial contact." (Tr. 65-66.) The VE found that such an individual would be precluded from any work. (Tr. 66.) No further questions were presented and hearing was promptly concluded. (Tr. 66-67.)

IV.    **Medical History**

The first medical record available is from September 28, 2007, when Claimant was assessed by Janet Wattles Mental Health Center ("JWC") as a condition of her probation for burglary. (Tr. 276.) The assessment notes indicate that Claimant had been previously treated at JWC from 1992 through 1996 as a juvenile with a reported history of "Dysthymia, Conduct Disorder, ADHD, back pain, lega[l] problems[,] and primary support problems." (Tr. 276.) Claimant was involved in several other juvenile treatment programs and expressed fear that she would have to "go back to Singer [Psychiatric Hospital]." (Tr. 276.)

The assessor noted that Claimant had been shot four-years earlier and participated in gang activity in the past. (Tr. 276.) A significant history of drug and alcohol abuse was also detailed in the report: alcohol use was present as early as the age of five; and varying degrees of mushroom, acid, ecstasy, crack cocaine, cannabis, and methamphetamine abuse was recorded during her teenage and adult years. (Tr. 278.)

As to her mental state, JWC wrote that Claimant experienced anxiety, difficulty focusing on tasks, mood swings, and had trouble getting along with other people. (Tr. 276.) During the evaluation, Claimant also stated that she had been taking weight-loss medication and she believed that the side-effects made her "angrier, mean, [and] suicidal." (Tr. 276.) She claimed to have stopped taking the pills after she was arrested a month before. (Tr. 276.) Since that time, she claimed that her mood swings and suicidal tendencies had resolved and she was "having a better relationship with her husband and children." (Tr. 276.) The record does not contain information regarding follow-up appointments at JWC. The next report does not show up until almost two years after the JWC probation assessment. (Tr. 298.)

On April 11, 2009, the record shows that Claimant was admitted to the Vista Medical Center hospital after displaying some risk of self-injury or suicide. (Tr. 298.) She reported that she had been off of psychotropic medications since she was seventeen and still experienced severe mood swings. (Tr. 299.) Claimant also admitted that she had recently been physically and mentally abusive to her "boyfriend" and that she was no longer able to control her anger. (Tr. 299.) She further explained that she had been separated from her husband for three years and was in the process of getting a divorce. (Tr. 301.)

During her time at Vista, doctors initially observed Claimant as "agitated and anxious" and she displayed "numerous anger outbursts." (Tr. 298.) Days later, her mood stabilized. (Tr. 298.) "Indeed[,] her mood is less irritable, nor depressed. She demonstrates appropriate affect. There is no evidence of her having suicidal or violent intentions," Dr. Art Pogre, M.D. observed. (Tr. 298.) Dr. Pogre notably reported that Claimant's GAF[2] was "27" when she arrived at Vista.

---

[2] The Global Assessment of Functioning ("GAF") is a rating of overall psychological functioning. Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders*, 34 (4th ed. 2000).

(Tr. 299.) She was diagnosed with "[b]ipolar I disorder," suicidal ideation, cocaine abuse, cannabis, and obesity. (Tr. 294.) She was released on April 13 and scheduled follow-up appointments. (Tr. 298.)

A few days later, on April 16, 2009, Claimant entered the Lake County Health Department of Behavioral Services ("LCHD") (Tr. 327.) Reports from the visit indicate Claimant's "racing thoughts, pressured speech," and that Claimant "talks loudly [and] is hyper-emotional, has insomnia and [complained] that her medications are not working." (Tr. 327.) However, Claimant had "[n]o thoughts, feelings[,] or plans of hurting [her]self or others." (Tr. 327.) "She's in good contact with reality today," Dr. Robert M. Kravets, M.D., wrote. (Tr. 327.) He prescribed Claimant a number of medications: Lithium, Seroquel, and Citalopram. (Tr. 324-325.) Claimant was diagnosed with a GAF of "45," refused hospitalization, and was given another appointment in five weeks. (Tr. 327.) Nonetheless, notes from LCHD indicate that Claimant was inconsistent when attending those scheduled appointments in April and May of 2009. (Tr. 325, 395-422.)

On August 7, 2009, Claimant was personally evaluated by DDS consultant and licensed Clinical Psychologist, Dr. Gregory C. Rudolph, Ph.D., just before her first application for benefits was denied. (Tr. 319.) In his report, Dr. Rudolph found that Claimant

- was "polite" and she gave "appropriate answers;"

- maintained eye-contact, but she exhibited "some slight body movement . . . with her restlessness and some slight rocking;"

- "had no difficulty understanding what was said to her;

- had a history of marijuana and alcohol abuse;

- had attempted to commit suicide by taking pills three months prior and had a history of suicidal behavior;

- was diagnosed with ADHD and had difficulty mentally focusing;

- takes medications, including Lithium, Seroquel, and Celexa;

- "displayed some mild vegetative symptoms," has low self-esteem, limited interests, and trouble sleeping at night;

- was able to take care of her basic needs, but "more advanced adaptive skills are limited;"

- cannot buy groceries from a list and does not know how to make change, but she "[was] able to perform arithmetical calculations" and her "knowledge of general information is adequate;"

- can use judgment, and reasoning skills; and

- has a history of legal problems;

(Tr. 321-322.)

Dr. Rudolph, however, did not provide his opinion concerning Claimant's residual functional capacity ("RFC") in his report.

Two weeks later, on August 20, 2009, DDS physician, Dr. Kirk Boyenga, reviewed Claimant's medical history and completed a mental RFC assessment form. (Tr. 347-356, 359-362.) Dr. Boyenga found that Claimant experienced "[d]isturbance of mood, accompanied by a full or partial manic or depressive syndrome, as evidenced by . . . [b]ipolar syndrome with a history of episodic periods manifested by the full symptomatic picture of both manic and depressive syndromes[.]" (Tr. 348.) Additionally, he opined that Claimant displayed behavioral changes "associated with the regular use of substances that affect the central nervous system." (Tr. 353.)

As to Claimant's functional limitations, Dr. Boyenga marked that her restriction of activities of daily living was mild; difficulties in maintaining social functioning were moderate; difficulties in maintaining concentration, persistence, or pace were also moderate; and that she had not experienced any episodes of decompensation of extended duration. (Tr. 355.) Further, he determined that Claimant's

- understanding and memory was not significantly limited;

- ability to maintain attention and concentration for extended periods of time, within the "Concentration and Persistence" area, was moderately limited;

- ability to work in proximity to others without being distracted by them, within the "Concentration and Persistence" area, was moderately limited;

- ability "to complete a normal workday . . . without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods," within the "Concentration and Persistence" area, is moderately limited;

- ability to interact appropriately with the public is moderately limited; and her

- ability to respond appropriately to changes in the work setting is moderately limited.

(Tr. 359-360.)

In all other categories, Dr. Boyenga found either "no evidence of limitation" or that Claimant was "not significantly limited." (Tr. 359-360.)

In his concluding paragraph, he writes

Claimant experiences an affective disorder and a substance addiction. The history of any severe mental impairment is quite recent, with a [April 2009] two-day hospital stay that was drug related. . . . Although the current impairment is fairly severe, [Claimant] has not been assessed in full sustained remission from the abuse of alcohol and other drugs. Since the initiation of treatment in April, [Claimant] has been evidencing gradual improvement . . . . Social skills are impaired, but allow settings with reduced interpersonal contact. Claimant relates well with

> [her] family. Adaptation abilities are limited, but allow routine, repetitive tasks. Claimant can follow instructions and travel independently.

(Tr. 361.)

Dr. Boyenga's findings were later affirmed by Dr. Jerrold Heinrich, another DDS physician, on January 2010. (Tr. 385-388.) Dr. Heinrich agreed that; despite her moderate limitations in the categories of "Concentration and Persistence," "Social Interaction," and "Adaptation;" Claimant could perform "simple, unskilled work which does not require frequent social interaction." (Tr. 388.) Dr. Heinrich's confirmation concludes Claimant's relevant medical history.

## V.  <u>Framework of Decision</u>

"Disabled" is defined as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). A physical or mental impairment is one that "results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C § 423(d)(3).

The ALJ proceeds through as many as five steps in determining whether a claimant is disabled. *See* 20 C.F.R. § 404.1520. The ALJ sequentially determines the following: (1) whether the claimant is currently engaged in substantial gainful activity, (2) whether the claimant suffers from a severe impairment, (3) whether the impairment meets or is medically equivalent to an impairment in the Commissioner's Listing of Impairments, (4) whether the claimant is capable of performing work which the claimant performed in the past, and (5) whether any other work

exists in significant numbers in the national economy which accommodates the claimant's

residual functional capacity ("RFC") and vocational factors. *See* 20 C.F.R. § 404.1520.

## VI.    Analysis

### A.    Step One: Is the Claimant Currently Engaged in Substantive Gainful Activity?

At Step One, the Commissioner determines whether the claimant is currently engaged in

substantial gainful activity. *See* 20 C.F.R. § 404.1520(b). Substantial gainful activity is work that

involves doing significant and productive physical or mental duties and is done, or intended to be

done, for pay or profit. *See* 20 C.F.R. § 404.1510. If the claimant is engaged in substantial

gainful activity, he or she is found "not disabled" regardless of medical condition, age,

education, or work experience, and the inquiry ends. If the claimant is not engaged in substantial

gainful activity, the inquiry proceeds to Step Two.

Here, the ALJ found that Claimant has "worked a variety of very short-term jobs after the

established disability onset date but [that] this work did not rise to the level of substantial gainful

activity." (Tr. 13.) The court affirms the ALJ's finding at Step One as it is based on substantial

evidence.

### B.    Step Two: Does the Claimant Suffer From a Severe Impairment?

Step Two requires a determination whether the claimant is suffering from a severe

impairment. A severe impairment is one which significantly limits the claimant's physical or

mental ability to do basic work activities. *See* 20 C.F.R. § 404.1520(c). The claimant's age,

education, and work experience are not considered in making a Step-Two severity determination.

*See* 20 C.F.R. § 404.1520(c). If the claimant suffers a severe impairment, then the inquiry moves on to Step Three. If the Claimant does not suffer a severe impairment, then the claimant is found "not disabled," and the inquiry ends.

In the present case, the ALJ found that Claimant suffered the following severe impairments: "bipolar disorder with depression; polysubstance abuse, in partial remission, by history; and obesity." (Tr. 14.) Substantial evidence supports the ALJ's finding. Neither party takes issue with the ALJ's Step-Two determination.

### C. Step Three: Does Claimant's Impairment Meet or Medically Equal an Impairment in the Commissioner's Listing of Impairments?

At Step Three, the claimant's impairment is compared to those listed in 20 C.F.R. pt. 404, subpt. P, app. 1 (the "Listings"). The Listings describe, for each of the body's major systems, impairments which are considered severe enough *per se* to prevent a person from adequately performing any significant gainful activity. *See* 20 C.F.R. §§ 404.1525(a); 416.925(a). The Listings streamline the decision process by identifying certain disabled claimants without need to continue the inquiry. *See Bowen v. New York*, 476 U.S. 467 (1986). Accordingly, if the claimant's impairment meets or is medically equivalent to a listed impairment, then the claimant is found to be disabled, and the inquiry ends. If not, the inquiry moves on to Step Four.

Here, the ALJ ruled that Claimant does not have an impairment, or a combination of impairments, that meet or medically equal one of the listed impairments in 20 C.F.R. 404. (Tr. 14.) This finding is not contentious and this Court affirms the ALJ's Step-Three determination.

**D.  Step Four: Is the Claimant Capable of Performing Work Which the Claimant Performed in the Past?**

At Step Four, the Commissioner determines whether the claimant's residual functional capacity ("RFC") allows the claimant to return to past relevant work.  Residual functional capacity is a measure of the abilities which the claimant retains despite his or her impairment.  20 C.F.R. § 404.1545(a).  The RFC assessment is based upon all of the relevant evidence, including objective medical evidence, treatment, physicians' opinions and observations, and the claimant's own statements about his or her limitations.  *Id.*  Although medical opinions bear strongly upon the determination of RFC, they are not conclusive; the determination is left to the ALJ who must resolve any discrepancies in the evidence and base a decision upon the record as a whole.  20 C.F.R. § 404.1527(e)(2); *see Diaz v. Chater*, 55 F.3d 300, 306 n.2 (7th Cir. 1995).

Past relevant work is work previously performed by the claimant that constituted substantial gainful activity and satisfied certain durational and recency requirements.  20 C.F.R. § 404.1565(a); S.S.R. 82-62.  If the claimant's RFC allows her to return to past relevant work, the claimant will not be found disabled; if the claimant is not able to return to past relevant work, the inquiry proceeds to Step Five.

**1. The ALJ's RFC Finding**

The ALJ's RFC determination was as follows:

> [C]laimant has the [RFC] to perform medium work as defined in 20 CFR 404.1567(c) and 416.967(c)[3] except I have determined that she is also limited to simple, routine, repetitive tasks with no more than brief superficial contact with the public, coworkers, or supervisors. Socially, she can interact for the needed time to learn the duties of the position.
>
> (Tr. 16.)

---

[3] Medium work is defined as work that requires "lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds." 20 CFR 404.1567(c).

Claimant asserts that the ALJ failed to adequately support her finding that Claimant can perform medium work. Of course, an RFC determination must include a discussion of how the ALJ examined the objective and subjective evidence and an explanation of how the evidence supports her ultimate decision. *See Eakin v. Astrue*, 432 F. App'x 607, 611 (7th Cir. 2011). The ALJ could have been more specific when articulating the reasoning behind the limitation, but the lack of specificity is not fatal to her decision.

After careful review of the entire record, the Court finds that it contains scarce evidence to support a variation from the ALJ's exertional finding that Claimant can perform medium work. Indeed, the only evidence in the record that might support any further limitation than medium work is Claimant's testimony that her "back hurts when [she has to] sit for periods of time" and that her "ankles hurt." (Tr. 54.) Yet, there is no medical or other objective evidence to show that Claimant is limited by these symptoms whatsoever. As a matter of fact, Claimant clearly testified at the hearing that she *did not* have any limitation in her ability to lift objects. (Tr. 54.) Considering the Claimant's statement, the original mental basis of her claim of disability, and the lack of objective support for physical limitations, the ALJ may have been somewhat accommodating by restricting Claimant to medium work.

Nevertheless, the ALJ appears to come to her "medium work" conclusion due to Claimant's severe impairment of obesity: "[Claimant] has significant medical problems which are exacerbated by obesity . . . [which] can cause limitation in . . . lifting, carrying, pushing, [or] pulling[.]" *See* SSR 02-01, (Tr. 17.) The ALJ determined that Claimant's "obesity does have a limiting effect on her ability to work, but no more than contemplated in the [RFC][.]" (Tr. 17.) With this record, the ALJ has stated enough.

Claimant also argues that the RFC determination was improper because the ALJ ignored portions of Dr. Rudolph's evaluation[4] that would support a finding of disability:

- Claimant's mood was moderately depressed;

- Claimant rocked back and forth;

- Claimant spoke in a rapid manner;

- Claimant had a history of mental illness;

- as a child, Claimant was angry and was reported to hurt others;

- as a teenager, Claimant was kicked out of a group home for fighting; and that

- Claimant has a history of suicide attempts.

(*See* Pl.'s Reply Br. at 2), (Tr. 320-322.)

The Court agrees that while an ALJ is not required to address every piece of evidence in the record, she may not ignore significant evidence that is contrary to her opinion. *See Zurawski v. Apfel,* 179 F.3d 507, 514 (7th Cir. 1999.) Yet, here, the ALJ does not ignore Dr. Rudolph's findings. (Tr. 17.) Although the ALJ may not have cited all of the previously listed facts, Claimant fails to show how exactly those facts are "contrary to" the ALJ's finding or how they might affect the ALJ's decision. The court finds Claimant's argument unavailing.

Third, Claimant argues that the ALJ improperly ignored Claimant's GAF scores as diagnosed by her treating physicians. Although an ALJ need not base her determination on Claimant's GAF scores, GAF scores should not be ignored, especially when the scores seem to conflict with the ALJ's determination. *See Lucas v. Astrue,* 2013 WL 3934221 at *7 (7th Cir.

---

[4] *See supra* p. 8.

2013); *Walters v. Astrue*, 2011 WL 5024149 at *4 (7th Cir. 2011.) (ALJ erred by not discussing all GAF scores); *Campbell v. Astrue,* 627 F.3d 299, 307 (7th Cir. 2010) (ALJ erred by failing to discuss GAF score); *Arnett v. Astrue*, 676 F.3d 586, 592 (7th Cir. 2012).

Here, Dr. Pogre assigned Claimant a GAF score of 25 upon her admission to Vista Medical Center and Dr. Kravets opined that Claimant had a GAF score of 45. *Supra* p. 7-8, (Tr. 299, 327.) A GAF rating of 25 shows "serious impairment, in communication or judgment (*e.g.*, sometimes incoherent, acts grossly inappropriately, suicidal preoccupation) OR inability to function in almost all areas (*e.g.*, stays in bed all day, no job, home, or friends); a score of 45 would indicate "[s]erious symptoms (*e.g.*, suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (*e.g.*, no friends, unable to keep a job)." Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders*, 34 (4th ed. 2000). These scores clearly do not coincide with the ALJ's findings at Step Four that Claimant's social functioning was only "moderately impaired." (Tr. 18.) Furthermore, it is true that the ALJ does not mention Claimant's scores in her determination.

However, the ALJ's determination tracked the findings of the DDS physicians, Dr. Boyenga and Dr. Heinrich, as she accorded their findings significant weight. (Tr. 18, 361, 388.). Even if the ALJ did not overtly list the Claimant's past GAF scores, the DDS physicians' notes mention those GAF reports and they were taken into consideration by the DDS physicians.[5] (Tr. 357, 361.) The Court finds that the ALJ appropriately accounted for the Claimant's GAF scores by adopting the findings of the physicans who knew of and reviewed those scores.

---

[5] Dr. Boyenga notes Claimant had "a 4/09 two-day hospital stay that was drug related." where Claimant was given a GAF of 27 and cites records of Dr. "Kravets at Lake [County]" where Claimant was diagnosed with a GAF of 45. (Tr. 357, 361.) Dr. Heinrich affirmed the opinions of Dr. Boyenga and that he reviewed the same medical history file. (Tr. 387, 388.)

**2. The ALJ's consideration of Claimant's moderate limitations in Concentration, Persistence, and Pace**

Next, Claimant argues that the case must be remanded because the ALJ failed to properly consider Claimant's limitations in concentration, persistence, and pace in her RFC. Claimant also believes that the ALJ similarly erred because she failed to include those limitations in her VE hypothetical as well. Although the subject matter of these contentions is spread between the fourth and fifth steps of this analysis, the Court will discuss both here within Step Four because the arguments are similar and to avoid any confusion.

In her written decision, the ALJ determined that "[m]oderate difficulties impair [Claimant] in regards to her concentration, persistence[, and] pace based on her statements of her mind wandering and her occasional polysubstance abuse." (Tr. 18.) In spite of these limitations, the ALJ did not include "limitations of concentration, persistence, or pace" within her RFC and she did not ask the VE explicitly to consider those limitations in her hypothetical. Instead, in both instances, the ALJ included limitations requiring "simple, routine, repetitive tasks." (Tr. 16, 61.)

Claimant is correct that the Seventh Circuit has historically rejected the notion that an ALJ may account for limitations in concentration, persistence, or pace solely by limiting a claimant to "simple, routine, repetitive tasks." *See Stewart v. Astrue*, 561 F.3d 679, 685 (7th Cir. 2009.) ("[t]he Commissioner continues to defend the ALJ's attempt to account for mental impairments by restricting the hypothetical to 'simple' tasks, and we and our sister courts continue to reject [that] position.") Yet, Claimant overlooks an important exception to that rule: an ALJ may use words such as "unskilled, simple, repetitive, routine" in hypothetical questions to the VE "if a doctor used [that] descriptive language to describe what work a claimant can

perform in spite of his limitations." *Martinez v. Astrue*, 2010 WL 1292491, at *11-12 (N.D. Ill., 2010) (internal citations omitted). *See also Johansen v. Barnhart,* 314 F.3d 283, 289 (7th Cir. 2002).[6]

Again, in the present case, the ALJ explicitly gave significant weight to the opinions of Drs. Boyenga and Heinrich. (Tr. 18, 361, 388.) Dr. Boyenga completed a mental RFC form indicating that Claimant suffered moderate limitations in "Concentration and Persistence." *Supra* p. 9-10, (Tr. 361.) Nevertheless, he opined that Claimant's limitations would still allow her to perform "routine, repetitive tasks." *Supra* p. 9-10, (Tr. 361.) Later, Dr. Heinrich concurred with Dr. Boyenga and found that Claimant could perform "simple, unskilled work which does not require frequent social interaction." *Supra* p. 10, (Tr. 388.) Thus, these physicians "translated" Claimant's limitations in concentration and persistence into a specific RFC assessment, determining that Claimant could still perform simple, routine, and repetitive work. (Tr. 361, 388.) In light of this exception, the Court finds that the ALJ properly accounted for Claimant's limitations in concentration, persistence, and pace within both the RFC at Step Four and the hypothetical posed to the VE at Step Five.

### 3. The ALJ's Credibility Finding

When assessing the credibility of a claimant's statements about his or her symptoms, including pain, the ALJ *should* consider the following in addition to the objective medical evidence: (1) the claimant's daily activities; (2) the location, duration, frequency, and intensity of the claimant's pain or other symptoms; (3) factors that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness, and side effects of any medication that the claimant takes or

---

[6]      In *Johansen*, the ALJ's hypothetical limiting the claimant to repetitive, low-stress work was proper where a medical expert translated the ALJ's finding of moderate limitations in the ability to maintain a regular schedule and attendance and to complete a normal workday and workweek without interruptions from psychologically-based symptoms into a specific RFC assessment that the claimant could still perform low-stress, repetitive work.

has taken to alleviate pain or other symptoms; (5) treatment, other than medication, the claimant receives or has received for relief of pain or other symptoms; (6) any measures other than treatment the claimant uses or has used to relieve pain or other symptoms; and (7) any other factors concerning the claimant's functional limitations and restrictions due to pain or other symptoms. S.S.R. 96-7p; *see* 20 C.F.R. § 404.1529(c). However, "[a]n ALJ is in the best position to determine a witness's truthfulness and forthrightness; thus, this court will not overturn an ALJ's credibility determination unless it is 'patently wrong.'" *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001).

Using the common boilerplate language, the ALJ found that Claimant's "statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent [that] they are inconsistent with the [RFC] assessment[.]" (Tr. 16.) Throughout her opinion, the ALJ considered facts that, in her view, undermined Claimant's alleged limitations:

- Claimant is able to pick things up, prepare simple meals, and maintains personal care, hygiene, and grooming. (Tr. 14, 17.)

- Although Claimant complained of pain in her hands at the hearing, she reported that the pain had ultimately resolved when visiting a doctor in October 2009. (Tr. 16-17.)

- Dr. Rudolph reported that Claimant had no difficulty understanding his instructions and questions. (Tr. 17.)

- Dr. Heinrich opined that Claimant could do simple, unskilled work that would not require frequent social interaction. (Tr. 17.)

- Recent examination indicates normal orientation, no thought disorder and only mildly impaired memory, and that Claimant can follow instructions and travel independently. (Tr. 17-18.)

- "While in the hospital . . . in April 2009[,] she was prescribed Topamax and Thorazine medications along with group and individual therapy, the claimant's mental status stabilized." (Tr. 18.)

- From August through December 2009, Claimant was taking Lithium, Seroquel, and Citalopram. Lithium and Seroquel prescriptions were replaced by Geodon because of weight gain. Even considering that Claimant was not taking medication at the time of the hearing, she testified that medication helped her symptoms. (Tr. 18.)

- There was no diagnosis or objective evidence to support her alleged symptoms of back and ankle pain. (Tr. 18.)

Although, the ALJ's credibility finding is not perfect, the ALJ has adequately supported her determination with evidence from the record. Claimant has not shown how the ALJ's credibility finding is "patently wrong" and the Court affords ALJs special deference in determining Claimant's credibility at hearing. *See Id.* The ALJ's credibility finding is affirmed.

### 4. Past Relevant Work

Lastly, the ALJ determined that Claimant had past relevant work as a lumber straightener, animal sticker, and escort guide. (Tr. 19.) Adopting the VE's opinion, the ALJ found that Claimant could not perform her past relevant work. (Tr. 19.) Neither party disagrees with this finding and the Court will not disturb it. Overall, the Court finds that the ALJ's Step Four determinations are based on substantial evidence and the analysis moves to Step Five.

### E. Step Five: Is Claimant is capable of performing work existing in substantial numbers in the national economy?

At Step Five, the Commissioner must establish that Claimant's RFC allows Claimant to engage in work found in significant numbers in the national economy. 20 C.F.R. §§ 404.1520(f), 404.1566. The Commissioner may carry this burden by relying upon the VE's testimony, or by showing that Claimant's RFC, age, education, and work experience coincide exactly with a rule in the Medical-Vocational Guidelines (the "Grids"). *See* 20 C.F.R. Ch. III, Part 404 Subpart P, Appendix 2; *Walker v. Bowen*, 834 F.2d 635, 640 (7th Cir. 1987); Social Security Law and

Practice, Volume 3, § 43:1. If the Commissioner establishes that sufficient work exists in the national economy that Claimant is qualified and able to perform, then Claimant will be found "not disabled." If no such work exists, Claimant will be found to be disabled.

Here, the ALJ determined that there are certain jobs existing in substantial numbers within northern Illinois that an individual with Claimant's age, education, work experience, and RFC could perform: sorter (21,000 jobs), laundry worker (52,000 jobs), and warehouse worker (32,000 jobs). (Tr. 63.) The ALJ's finding is consistent with the VE's testimony at the hearing and neither party challenges these findings aside from the issues already addressed earlier in this opinion. *Supra* p. 17-19. Therefore, the ALJ's finding at Step Five is affirmed.

**VII.**     **Conclusion**

In light of the foregoing reasons, Claimant's motion for summary judgment is denied and Commissioner's motion for summary judgment is granted.

**ENTER:**

_____
**P. Michael Mahoney, Magistrate Judge**
**United States District Court**

**DATE: September 18, 2013**